UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  08-cv-01641-WYD-CBS

ROBERT W. MILLER; and
MARJORIE E. MILLER,

      Plaintiffs,

v.

U.S. DEPARTMENT OF THE INTERIOR, an agency of the U.S. government;
DIRK KEMPTHORNE, in his official capacity as secretary of the U.S. Department of the
Interior;
U.S. BUREAU OF LAND MANAGEMENT, an agency of the U.S. Department of the
Interior; and
SALLY WISELY, in her official capacity as Colorado State Director of the U.S. Bureau of
Land Management,

      Defendants.

---

## ORDER

---

THIS MATTER came before the Court during a hearing on June 22, 2009, on two

related matters.  The first is a review, pursuant to the Administrative Procedure Act, of

the Interior Board of Land Appeals' order of July 15, 2008 in which it upheld the Bureau

of Land Management's decision declaring Plaintiffs' unpatented mining claims void and

forfeited.  The second matter is Defendants' Motion to Strike Exhibits Attached to

Plaintiffs' Opening Brief [doc. #14], filed November 17, 2008, to which Plaintiffs

responded on December 8, 2008.  Defendants did not file a reply.  Plaintiffs filed their

Complaint commencing the present action on August 4, 2008, and the Administrative

Record was filed on October 27, 2008.  Plaintiffs filed their Opening Brief on November

10, 2008, Defendants responded on December 23, 2008, and Plaintiffs replied on

January 14, 2008.  Defendants also filed a Notice of Supplemental Submission on June

25, 2009, and Plaintiffs responded on June 29, 2009.  Taking into consideration the

Administrative Record, filings by the parties, and arguments presented at the hearing, I

enter the following written Order.

## A. FACTUAL BACKGROUND

The facts of the present case are largely undisputed.  Plaintiffs Robert and

Marjorie Miller are individuals in their eighties who were deeded five mining claims from

Marjorie's father in 1958.  The claims are named the Robin Redbreast, the Governor,

the Senator, the President, and the Boulder.

### 1. Prior Litigation

In 1984, on behalf of the U.S. Forest Service, BLM began a long mineral contest

against the Robin Redbreast claim.  Plaintiffs eventually prevailed in that contest by

IBLA decision in 1997.  However, because of Defendants' subsequent delay in allowing

the mining to occur, Plaintiffs filed suit in this Court and proceeded before Judge Lewis

T. Babcock.  *See Miller v. U.S. Forest Serv.*, No. 99-cv-802-LTB-CBS.  The parties

again appeared before the IBLA in 2005, and Plaintiffs again prevailed.  The case in this

Court was reinstituted in 2006 in connection with a mining plan submitted to the Forest

Service in 2003, and Plaintiffs ultimately obtained approval for that project in 2007.

Documentation of the previous rounds of administrative review and litigation is

the subject of Defendants' Motion to Strike.  The Defendants' Notice of Supplemental

Submission contains a June 23, 2009 IBLA order denying Plaintiffs' application for

attorneys' fees and costs in reference to the mining claim contest brought by the Forest Service.  Therein, the IBLA "conclude[d] that, even if the proceeding in question were to be considered an 'adversary adjudication,' . . . the Government was substantially justified in pursuing the contest and subsequent administrative review."  *Robert W. & Marjorie E. Miller*, 177 IBLA 352 (2009) (Notice of Supplemental Submission Ex. 2), slip op. at 2.

### 2. Administrative Record and Events Leading to Administrative Decision

On March 31, 2008, BLM issued a decision declaring Plaintiffs' five unpatented mining claims void and forfeited by operation of law.  (Administrative R. [hereinafter "AR"] 25-27.)   The decision stated that Plaintiffs had failed to pay the $125 maintenance fee required by statute, or to apply for a waiver, by the appropriate deadline, thus forfeiting their mining claims.  (AR 25.)  According to the BLM decision, the deadline had been September 4, 2007, because the usual deadline of September 1 fell during a holiday weekend in 2007.  (AR 25.)  BLM had received Plaintiffs' waiver certification on September 17, 2007, in an envelope postmarked September 14, 2007. (AR 26.)  On September 18, BLM had cashed the $50 check that it had received in conjunction with the affidavit of labor Plaintiffs had also submitted, but BLM indicated in its decision that it was refunding the amount.  (AR 21, 26.)  Plaintiffs acknowledge that they received a refund check but did not cash it.  (Opening Br. 8 n.32.)

On April 21, 2008, Plaintiffs sent BLM a letter in which they voiced their disagreement with the decision, and they also sent a check for $625 and one for $50. (AR 31-34.)  The letter explained that the $50 was resubmitted as a service charge and

that the $625 accounted for the $125 maintenance fee for each of their five claims, in case the waiver was not granted.  (AR 32.)  BLM cashed both checks (AR 28), and Defendants admit to having kept the money.  Defendants simply assert that they were entitled to keep the $50 and should not have refunded it originally (Response Br. 44), and they also state that "BLM will refund the $625."  (Response Br. 14 n.7.)  Plaintiffs again submitted filings in August 2008, and BLM again cashed their $50 check without providing a refund.  (AR 38; Opening Br. 10 n.39).

During the course of these events, Plaintiffs were in the midst of project permitting, and, between September 2007 and April 2008, when they received notice of BLM's decision, they spent between $36,000 and $37,000 to further improve their mining claims.  (AR 86, 190.)  Plaintiffs filed an administrative appeal of the decision, which the IBLA affirmed on July 15, 2008.  *Robert & Marjorie Miller*, No. IBLA 2008-149, CMC 164159-164163 (Jul. 15, 2008) (AR 217-20).  Plaintiffs now request injunctive and declaratory relief overturning and preventing enforcement of Defendants' decisions, along with attorneys' fees and costs and any other appropriate relief.

**B. LEGAL BACKGROUND**

**1. Pertinent Statutory and Regulatory Provisions**

At issue is BLM's and the IBLA's interpretation of the statutory and regulatory schemes governing the present case.  First, 30 U.S.C. § 28f(a) provides, "The holder of each unpatented mining claim, . . . shall pay to the Secretary of the Interior, on or before September 1 of each year . . . a claim maintenance fee of $100 per claim or site[.]"  30 U.S.C. § 28i then denotes the consequences for failure to pay the fee:

> Failure to pay the claim maintenance fee or the location fee as required by sections 28f to 28k of this title shall conclusively constitute a forfeiture of the unpatented mining claim, mill or tunnel site by the claimant and the claim shall be deemed null and void by operation of law.

In 2004, BLM raised the maintenance fee from $100 to $125 by regulation.  *See* 43 C.F.R. § 3830.21(d).

The statute also allows for a waiver of the fee upon application: "The claim maintenance fee required under this section may be waived for a claimant who certifies in writing to the Secretary that on the date the payment was due, the claimant and all related parties . . . held not more than 10 mining claims . . . on public lands . . . ."  30 U.S.C. § 28f(d)(1).  The waiver provision further states:

> If a small miner waiver application is determined to be defective for any reason, the claimant shall have a period of 60 days after receipt of written notification of the defect or defects by the Bureau of Land Management to: (A) cure such defect or defects, or (B) pay the $100 claim maintenance fee due for such period.

30 U.S.C. § 28f(d)(3).

The statute vests in the Secretary of the Interior the authority to "promulgate rules and regulations to carry out the terms and conditions of sections 28f to 28k . . . ."  20 U.S.C. § 28k.  While the statute contains no deadline for the waiver certification, the implementing regulations provide that the deadline is September 1 of each year.  *See* 43 C.F.R. § 3835.10(a).  Regulations also provide, "If there is a defect in your compliance with a regulatory, but not statutory, requirement the defect is curable."  43 C.F.R. § 3830.93(b).

### 2. IBLA Order

In its order of July 15, 2008, in which it upheld BLM's decision, the IBLA stated:

> The Board acknowledges the long history of litigation and frustration surrounding the Millers' efforts to develop the Robin Redbreast claim as described in their filings. *See United States v. Miller*, 165 IBLA 342 (2005); *United States v. Miller*, 138 IBLA 246 (1997). However, the only issue before us in this appeal is whether BLM erred in its March 31, 2008, decision. We conclude that it did not.

(AR 218.) The IBLA rejected Plaintiffs' argument that they should have been given an opportunity to cure by finding that the September 1 deadline was a statutory, rather than a regulatory, requirement, for which there was thus no cure. The Board reasoned:

> Although the statute does not separately and explicitly set September 1st as the deadline for filing a Waiver Certification, the Secretary's authority to allow the filing of a waiver after the date required for payment of the maintenance fee is necessarily constrained by the plain text of the statute requiring the maintenance payment to be made on or before September 1. Thus, to the extent Waiver Certifications are allowed by the Secretary, they must be filed on or before September 1st of each required year to comply with the statute.

(AR 219 (citation and footnote omitted).)

The IBLA then found that neither it nor BLM had any authority to afford Plaintiffs any relief from this statutory requirement, stating, "In the absence of a timely-filed maintenance fee payment or Waiver Certification, BLM had no choice but to declare the claims forfeited by operation of law." (AR 219.) Finally, the IBLA responded to Plaintiffs' various arguments resting upon constitutional and equitable principles by stating, "To the extent appellants have offered other arguments in support of their position, we have reviewed them and conclude that they do not provide any basis for overturning BLM's decision." (AR 220.)

### 3. Standard of Review

The Administrative Procedure Act requires a court reviewing an administrative decision to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.  It further requires the court to

> hold unlawful and set aside agency action, findings, and conclusions found to be– (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  A court "may affirm agency action, if at all, only on the grounds articulated by the agency itself."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1565 (10th Cir. 1994).

The Tenth Circuit has held that under the APA, the administrative board's findings are conclusive if supported by substantial evidence but that questions of law are reviewed de novo.  *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007); *Newton v. FAA*, 457 F.3d 1133, 1136 (10th Cir. 2006).  However, the APA requires deference to the IBLA.  *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."

*Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) (quoting *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "We will not set aside agency action unless it is 'procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.'"  *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1222 (10th Cir. 2009) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

The Tenth Circuit has emphasized the "arbitrary and capricious" aspect of the APA standard and held that review is confined to whether the agency considered the relevant data and rationally explained its decision.  *Ariz. Pub. Serv. Co.*, 562 F.3d at 1222; *Colo. Wild*, 435 F.3d at 1213.  Specifically, the Tenth Circuit has stated:

> Agency action is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Ariz. Pub. Serv. Co.*, 562 F.3d at 1123 (quoting *Motor Vehicles*, 463 U.S. at 43).  "We will not set aside agency action on account of a less-than-ideal explanation as long as the agency's decisionmaking process may reasonably be discerned."  *Ariz. Pub. Serv. Co.*, 562 F.3d at 1123 (citing *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)).

The Tenth Circuit has further held that an agency's interpretation of an ambiguous statute is entitled to *Chevron* deference.  *Ariz. Pub. Serv. Co.*, 562 F.3d at 1123 (citing *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984)).  The Tenth Circuit has articulated the standard under *Chevron* as follows:

"If the statute is clear, we apply its plain meaning," and the inquiry ends.  If the statute is silent or ambiguous about the question at issue, . . . we defer to the authorized agency and "apply the agency's construction so long as it is a reasonable interpretation of the statute."  An agency is entitled to *substantial* deference when it acts pursuant to an interpretation of its own regulation.

*Ariz. Pub. Serv. Co.*, 562 F.3d at 1123 (quoting *Qwest Corp. v. FCC*, 258 F.3d 1191,

1199 (10th Cir. 2001) (citing *Chevron*, 467 U.S. at 843-44)).  Furthermore, "the agency's

interpretation is controlling unless plainly erroneous or inconsistent with the regulation."

*Ariz. Pub. Serv. Co.*, 562 F.3d at 1123 (quotation omitted).  However, "[a]n agency

interpretation of a relevant provision which conflicts with the agency's earlier

interpretation is entitled to considerably less deference that a consistently held agency

view."  *Exxon Corp. v. Lujan*, 970 F.2d 757, 762 (10th Cir. 1992) (quoting *INS v.

Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987)) (internal quotation marks omitted).

## C. MOTION TO STRIKE

Defendants have moved to strike the exhibits Plaintiffs attached to their opening

brief, through which Plaintiffs document their previous litigation with Defendants.

Plaintiffs ask the Court to take judicial notice of these previous decisions, complaints,

and transcripts.  (*See* Opening Br. 4 n.2, Ex. A-H.)  They have also submitted a timeline

that traces the history of the litigation.  (Opening Br. Ex. I.)  There are three exceptions

to the principle that a court's review of an administrative decision is limited to the

administrative record: 1) where the record fails to disclose the factors considered by the

agency, 2) where necessary for background information or for determining whether the

agency considered all relevant factors including evidence contrary to the agency's

position, or 3) where necessary to explain technical terms or complex subject matter

involved in the action.  *Franklin Sav. Ass'n v. Dir., Office of Thrift Sav.*, 934 F.2d 1127,

1137 (10th Cir. 1991).  A court can take judicial notice of government documents or

records of prior litigation under Federal Rule of Evidence 201, as long as the litigation is

directly or closely related to the case at hand.  *United States v. Ahidley*, 486 F.3d 1184,

1192 n.5 (10th Cir. 2007) ("Although we are not obliged to do so, we may exercise our

discretion to take judicial notice of publicly-filed records in our court and certain other

courts concerning matters that bear directly upon the disposition of the case at hand.");

*Amphibious Partners, LLC v. Redman*, 534 F.3d 1357, 1362 (10th Cir. 2008) (citing *St.*

*Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("Judicial

notice is particularly applicable to the court's own records of prior litigation closely

related to the case before it")).

  I will not strike the exhibits because I find that they fit into both the first and

second exceptions, but I also will not take judicial notice because the prior litigation is

not directly or closely related to the present case.  The exhibits disclose additional

factors considered by the IBLA, and they provide necessary background information.

The IBLA referred to the history of prior litigation in its order, and Plaintiffs referred to

and relied on this history repeatedly in their briefs to the IBLA.  Furthermore, there are

excerpts of the transcripts already included in the Administrative Record.  (AR 107,

110.)  Accordingly, I find that documentation of this previous litigation, of which the IBLA

was apprised and to which the parties have referred repeatedly, fits within the first two

exceptions and I should consider it in addition to the administrative record.

Nonetheless, because the present action concerns a matter apparently separate from the subject of the previous litigation, I find that the two matters are not directly or closely related, and thus I will not take judicial notice of Plaintiffs' exhibits.  As stated by Plaintiffs, the previous litigation challenged whether Plaintiffs had located a valuable mineral deposit on the Robin Redbreast claim (Opening Br. 5-6), while the present matter involves their alleged failure to meet a deadline by paying a maintenance fee or filing a waiver certification.  Plaintiffs could have established a closer relationship by demonstrating that in light of the long history between the parties, the present matter results from some arbitrary, animus-driven action on the part of Defendants, but Plaintiffs have presented no evidence of such action.  Rather, the IBLA has ruled on several previous occasions that failure to file the maintenance fee by the deadline renders a mining claim void and does not present the opportunity to cure, thus demonstrating that the present action was not arbitrarily taken.  *See David G. Kukowski*, 169 IBLA 19 (2006); *Otto Adams*, 155 IBLA 1 (2001); *Howard J. Hunt*, 147 IBLA 381 (1999); *Goldie James M.B.M. Mining Corp.*, 143 IBLA 289 (1998).  Accordingly, the relationship between the prior litigation and the present matter is not strong enough for me to take judicial notice, and though I will not strike the exhibits, the extent of this relationship also impacts the weight I will give to these exhibits.

## D. ADMINISTRATIVE REVIEW

Turning to the administrative review pursuant to the APA, I find that I must set aside the IBLA's order and grant Plaintiffs' requested relief based on two alternative grounds.  First, an analysis of the pertinent statutory and regulatory schemes leads me

to find that the September 1 deadline for waiver certification is a regulatory deadline that allows for cure.  Second, an analysis of equitable principles leads me to find that Plaintiffs have satisfied the requirements for estoppel.  My findings are strengthened by the lower level of deference owed to the IBLA's findings with respect to these two issues.

### 1. Interpretation of Statutes and Regulations

With regard to interpretation of the pertinent statutory and regulatory schemes, I find that the IBLA is entitled to "considerably less deference" because of its conflicting findings.  *See Cardoza-Fonseca*, 480 U.S. at 446 n.30; *Exxon Corp.*, 970 F.2d at 762. In the present matter, the IBLA found the September 1 deadline to be a statutory requirement, reasoning that although the deadline is not set out in the statute, the Secretary's authority to set a deadline was necessarily constrained by the statute's maintenance fee deadline.  (AR 219.)  The IBLA was able to rely on its same finding in a previous matter.  (AR 219 (citing *Hunt*, 147 IBLA at 384).)

However, on different occasions, the IBLA has emphasized the regulatory nature of this deadline.  In *Adams*, the Board stated:

> No statute . . . has ever specified the deadline for filing a waiver certification, in lieu of payment of the maintenance fee.  Thus, no statute presently requires submission of a waiver certification by September 1 of each year . . . .  Nor does any statute provide that the failure to do so conclusively constitutes a forfeiture of the affected claim, rendering it null and void by operation of law.  Rather, all that has long been (and continues to be) provided by regulation. . . . We have nevertheless long held that the regulatory deadline for filing a waiver certification is binding on a claimant, and that the failure to timely file (absent payment of the maintenance fee) results in the automatic forfeiture of the affected claim.

155 IBLA at 3.  More recently, the Board stated, "*BLM's regulations* require claimants to

submit waiver certifications on or before September 1 of the calendar year the certification is due." *Kukowski*, 169 IBLA at 20 (emphasis added). In *Kukowski*, the IBLA stated that the September 1 deadline for filing of the certification waiver is the intent of the Secretary, and it emphasized the Secretary's authority to establish that deadline. *Id.* at 23. The emphasis on the regulatory nature of the deadline is consistent with two previous IBLA decisions. *See James*, 143 IBLA at 292-94; *Alamo Ranch Co.*, 135 IBLA at 75.

In this line of cases, the IBLA has emphasized that the regulatory deadline must be enforced without opportunity for cure, but the Board has since undercut this finding. In *Larry Andrus*, the IBLA relied on its regulation allowing cure of failure to meet a regulatory requirement, 43 C.F.R. § 3830.93(b), to allow cure for noncompliance with a regulatory deadline. 169 IBLA 353 (2006); *see also Harvey A. Clifton*, 60 IBLA 29 (1981). In the present case, the IBLA distinguished *Andrus* on the basis that the waiver certification deadline is a statutory requirement, thus implying that if it had found the maintenance fee deadline to be a regulatory requirement, cure would be allowed. (*See* AR 218-19.) Allowing cure of failure to meet a regulatory requirement is also consistent with the Tenth Circuit's finding that a claim cannot be deemed abandoned for failure to comply with requirements that are contained in regulations but not statutes. *Topaz Beryllium Co. v. United States*, 649 F.2d 775, 778 (10th Cir. 1981). Thus, the IBLA has consistently held that although the September 1 deadline is not contained in the statute but rather only the applicable regulation, it still does not allow for cure. However, the

IBLA's reasoning for disallowing the cure has been inconsistent, and accordingly its findings in this regard are entitled to lesser deference from this Court.

Taking into account this lesser deference, I now find that the deadline is a regulatory requirement that allows for cure.  As the IBLA has repeatedly acknowledged, nowhere does the statute provide a deadline for filing a waiver certification, but rather this deadline is contained within the incorporating regulation.  Furthermore, the statute is ambiguous, for while it provides that failure to meet the September 1 deadline for the maintenance fee results in forfeiture of mining claims, it also provides for the filing of a waiver certification, which is curable if defective for any reason.  This ambiguity is resolved by turning to the regulations, which provide the deadline for filing the waiver certification.  Accordingly, the deadline is a regulatory requirement.

It is provided by regulation that defects in complying with regulatory requirements allow for cure, and the IBLA has found that such curable defects include late filings. *See* 43 C.F.R. § 3830.93(b); *Andrus*, 169 IBLA 353; *see also Topaz Beryllium*, 649 F.2d at 778.  This interpretation is consistent with the general policy that forfeiture is disfavored and forfeiture provisions should be construed strictly.  *See United States v. Herndon*, 982 F.2d 1411, 1418 n.9 (10th Cir. 1992); *Clifton*, 60 IBLA at 34.  Because I "may affirm agency action, if at all, only on the grounds articulated by the agency itself," *Olenhouse*, 42 F.3d at 1565, I will not consider the other rationalizations provided by Defendants in support of the IBLA's ultimate finding that Plaintiffs were not allowed to cure their late filing of the waiver certification.  In conclusion, taking into account the lessened deference to the IBLA, I find its findings in this matter to be not in accordance

with the law, and I find that Plaintiffs should have been allowed to cure their late filing of the waiver certification.

### 2. Equitable Estoppel

As an alternative ground, I find that the equitable principle of estoppel requires me to reverse the IBLA's decision.  In its decision, the IBLA provided the following reasoning for rejecting all of Plaintiffs' arguments outside of the issue of statutory and regulatory interpretation: "To the extent appellants have offered other arguments in support of their position, we have reviewed them and conclude that they do not provide any basis for overturning BLM's decision."  (AR 220.)  This statement does not satisfy even the low standard under the APA that the agency consider the relevant data and rationally explain its decision, as the agency's decisionmaking process may not reasonably be discerned.  *See Ariz. Pub. Serv. Co.*, 562 F.3d at 1222; *Colo. Wild*, 435 F.3d at 1213.  Accordingly, this Court owes no deference to the IBLA's findings with respect to its rejection of Plaintiffs' appeals to principles of equity, as these appeals were included among the arguments that the IBLA summarily rejected without rational explanation.

"Statutory filing deadlines are generally subject to the defenses of waiver, estoppel, and equitable tolling."  *United States v. Locke*, 471 U.S. 84, 94 n.10 (1985).  Plaintiffs argue that "the defendants' decision cannot stand on the basis of equitable estoppel, laches or unclean hands."  (Opening Br. 39.)  As a preliminary matter, I reject Plaintiffs' defenses of laches and unclean hands because these defenses only apply to equitable and not legal claims.  *See Haynes Trane Serv. Agency, Inc. v. Am. Standard,*

*Inc.*, 562 F.3d 1047, 1057 (10th Cir. 2009) (only parties with clean hands can invoke

equitable relief); *Grynberg v. Total, S.A.*, 538 F.3d 1336, 1353 (10th Cir. 2008) ("The

traditional rule for equitable claims . . . is that timeliness is determined under the

doctrine of laches. . . . But the traditional rule must yield to legislative authority . . . .").

Furthermore, neither laches nor unclean hands was listed by the Supreme Court in

*Locke* as among the defenses available with respect to statutory filing deadlines.

Finally, Plaintiffs do not assert a colorable defense under laches or unclean hands but

rather conflate these theories with equitable estoppel, which is in fact listed as a

possible defense in *Locke*.  Accordingly, Plaintiffs' arguments with respect to laches and

clean hands are inapposite.

  However, I find that Plaintiffs do prevail on their equitable estoppel claim.  "To

state a claim of estoppel against a private party, a litigant must establish four elements:

'(1) the party to be estopped must know the facts; (2) the party to be estopped must

intend that his conduct will be acted upon or must so act that the party asserting the

estoppel has the right to believe that it was so intended; (3) the party asserting the

estoppel must be ignorant of the true facts; and (4) the party asserting the estoppel

must rely on the other party's conduct to his injury.'" *Rios v. Ziglar*, 398 F.3d 1201, 1208

(10th Cir. 2005) (quoting *Kowalczyk v. INS*, 245 F.3d 1143, 1149 (10th Cir. 2001)).  "A

claim of estoppel against the government requires an additional element: the party

asserting estoppel must show that the government has engaged in 'affirmative

misconduct.'" *Rios*, 398 F.3d at 1208.  "Affirmative misconduct means an affirmative act

of misrepresentation or concealment of a material fact.  Mere negligence, delay,

inaction, or failure to follow agency guidelines does not constitute affirmative misconduct." *Bd. of County Comm'rs of the County of Adams v. Isaac*, 18 F.3d 1492, 1499 (10th Cir. 1994); *see also FDIC v. Hulsey*, 22 F.3d 1472, 1490 (10th Cir. 1994) ("Mere delay, though lengthy, in processing a petition is not affirmative misconduct."). "[T]he Supreme Court has alerted the judiciary that equitable estoppel against the government is an extraordinary remedy." *Isaac*, 18 F.3d at 1498 (citing *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 421-22 (1990)). "The [Supreme] Court has repeatedly 'le[ft] for another day whether an estoppel claim [can] ever succeed against the Government.'" *Kowalczyk*, 245 F.3d at 1149 (quoting *Richmond*, 496 U.S. at 423 (alterations in original)); *see also FDIC*, 22 F.3d at 1490.

Plaintiffs allege two sources of affirmative misconduct committed by Defendants. One is the twenty-four years of "delay" through the litigation to which Defendants have subjected Plaintiffs. I reject this argument as inapposite, because, as noted above in my analysis of the Motion to Strike, the present matter appears to be distinct from the previous litigation. The second source of alleged affirmative misconduct surrounds BLM's delay in informing Plaintiffs of its decision to declare their mining claims void and its repeated cashing of Plaintiffs' checks despite this decision. First, BLM cashed Plaintiffs' initial $50 check on September 18, 2007, and it did not inform Plaintiffs until March 31, 2008 that Plaintiffs' submission was late, thus rendering their claims void, and that BLM would refund the check. Second, when Plaintiffs mailed an attempted cure letter on April 21, 2008, BLM cashed the accompanying checks that accounted for both the $50 service fee and the $625 maintenance fee, and it has not provided any

refund.  Finally, BLM again cashed the $50 check Plaintiffs submitted with their filings in

August 2008, and BLM has not refunded this money.  Between September 2007 and

April 2008, when Plaintiffs received notification of BLM's decision, Plaintiffs incurred

$36,000 to $37,000 in expenses in further developing their mining claims.

    The delay of six months in itself does not constitute affirmative misconduct.  *See,*

*e.g.*, *Rios*, 398 F.3d at 1209 ("The INS's failure to notify Mr. Rios immediately that his

filing fee was inadequate is evidence of negligence, at most."); *Kowalczyk*, 245 F.3d at

1150 (BIA's nine-year delay in deciding the plaintiff's appeal, though deeply troubling,

did not constitute affirmative misconduct, in part because there was no showing that the

delay was deliberate).  However, delay alone is not presently the issue.  The Tenth

Circuit has suggested that the improper cashing of a check associated with an

application fee could constitute affirmative misconduct.  *See Rios*, 398 F.3d at 1209-10.

In *Rios*, the Tenth Circuit rejected the argument that the cashing of the check that

accompanied the plaintiff's application could lead to equitable estoppel, but the Tenth

Circuit's reasoning was that the economic injury resulted from the cashing of the check

itself, not from reliance on that conduct.  *Id.* at 1210.  In contrast, in the present case,

Plaintiffs sustained substantial economic injury, in the form of the expenditure of over

$36,000, in reliance on the cashing of their check submitted in September 2007.

    Defendants respond to this claim of affirmative misconduct by, first, contending

that it was unreasonable for Plaintiffs to rely on the cashing of the $50 check either in

September 2007 or April 2008 because Defendants were entitled to keep that money

and, second, stating that they will return the $625 sent in April.  Defendants have said

nothing with respect to the check cashed in August 2008.  I agree with Defendants that the reasonable construction of the $50 check submitted in September 2007 was that it was not for the waiver certification, for which no fee is ever required, but rather for Plaintiffs' affidavit of assessment work, which was included in the same envelope.  *See* 43 C.F.R. § 3835.32(c) (processing fee required with affidavit of assessment work for each mining claim affected); 43 C.F.R. § 3835.10 (processing fee not among requirements for what to include with waiver certification); 43 C.F.R. § 3830.21 (no fee for filing waiver certification in list of mining claim fees).  However, I disagree that it was unreasonable for Plaintiffs to rely on the cashing of this check to their detriment, because Defendants have undercut their own position that they are entitled to keep the money by having refunded the money pursuant to their March 31, 2007 decision.

Furthermore, Defendants' conduct as a whole with regard to Plaintiffs' checks has led Plaintiffs reasonably to believe that their claims remained valid.  Defendants have continued to cash Plaintiffs' checks without any indication of potential refund, except for Defendants' claim that they will refund the $625 paid in April 2008.  And this claim is problematic for two reasons.  First, fifteen months after receiving the check for $625, Defendants still have not refunded Plaintiffs their money.  Second, BLM regulations provide, "BLM will refund maintenance and location fees if . . . [a]t the time you paid the fees, the mining claim or site was void."  43 C.F.R. § 3830.22(b)(2).  In light of Defendants' claim that Plaintiffs' mining claims became void on September 4, 2007, this money should have been refunded already.  Accordingly, I find that Defendants'

repeated pattern of conduct with regard to Plaintiffs' multiple payments, coupled with the delay, constituted more than mere negligence but rather affirmative misconduct.

I also find that Plaintiffs have established the four elements of equitable estoppel. First, Defendants knew the facts.  Second, Plaintiffs had the right to believe that Defendants intended Plaintiffs to act upon Defendants' conduct.  Specifically, Defendants' repeated cashing of Plaintiffs' checks gave Plaintiffs the right to believe that Defendants intended them to continue developing their mining claims.

With regard to the third requirement that Plaintiffs must be ignorant of the true facts, Defendants claim that Plaintiffs could not have been ignorant of the requirement to file their waiver certification by the deadline, because they had complied with the requirements of 30 U.S.C. §28f every year between 1993 and 2006, and because Plaintiffs are generally responsible for knowing the requirements of the laws.  I find Defendants' arguments unpersuasive.  I have already found that Defendants' interpretation of the statutory and regulatory schemes does not reflect the "true facts" and that Plaintiffs were entitled to cure their late filing.  However, even if the "true facts" did require Plaintiffs to file their waiver certification by September 4, 2007, Plaintiffs' past compliance does not necessarily indicate that they had knowledge of this interpretation of the statute.

In *Locke*, the Supreme Court held with regard to the filing deadline provided in 43 U.S.C. § 1744(a), "That these claimants have made one filing under the Act indicates that they know, or must be presumed to know, of the existence of the Act and of their need to inquire into its demands."  471 U.S. at 108.  However, *Locke* is distinguishable

because the Supreme Court was responding to an argument pursuant to the notice requirements of the Due Process Clause, which would present Plaintiffs with a much higher bar than that required to show whether they were ignorant of the true facts under the estoppel analysis.  *See id.* at 108 & n.16.  Furthermore, the statute pertinent to *Locke* is unambiguous, and the Supreme Court was able to rely on the enactment and publishing of the statute to provide Plaintiffs with adequate notice of its requirements. *Id.*  In contrast, the statute presently at issue is ambiguous, so even if Defendants' interpretation of the statute is correct, one cannot assume that Plaintiffs knew of that interpretation.  Plaintiffs' conduct surrounding the present matter suggests that they were in fact unaware of Defendants' interpretation of the statute.

Finally, the fourth requirement of Plaintiffs' detrimental reliance on Defendants' conduct is satisfied by their expenditure of over $36,000 on further development of their mining claims after Defendants cashed the $50 check in September 2007.  In conclusion, as an alternative ground to statutory and regulatory analysis, I find that Plaintiffs have established the elements of equitable estoppel and that Defendants are estopped from gaining forfeiture of Plaintiffs' mining claims.

**E. CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that Defendants' Motion to Strike Exhibits Attached to Plaintiffs' Opening Brief [doc. #14], filed November 17, 2008, is **DENIED**.  It is

FURTHER ORDERED that the decision of the IBLA of July 15, 2008 is **REVERSED** and Plaintiffs are entitled to judgment on their claims.  In accordance

therewith, it is

ORDERED that Plaintiffs are entitled to declaratory judgment in accordance with what is contained in this Order, and Defendants are hereby enjoyed from enforcing BLM's decision of March 31, 2008, whereby Plaintiffs' mining claims were declared null and forfeited.

Dated:  July 6, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge